**MURRAY SPACE SHOE CORPORA-TION, Alan E. Murray and Lucille Marsh Murray, individually and as officers of said Corporation and as co-partners doing business as Alan E. Murray Laboratories, Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 304, Docket 27312.**

United States Court of Appeals
Second Circuit.

Argued May 9, 1962.

Decided June 7, 1962.

Edmund B. Bellinger, New York City, for petitioners.

Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C. (James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Frederick H. Mayer, John Gordon Underwood, Attys.,

Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before CLARK, KAUFMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge.

Petitioners seek to set aside an order of the Federal Trade Commission requiring them to cease and desist from certain advertising practices found false and misleading in violation of § 5 of the Federal Trade Commission Act, 66 Stat. 632 (1952), 15 U.S.C.A. § 45. We affirm and grant enforcement of the order.

Petitioners are engaged in the business of manufacturing and selling custom made shoes. The shoes are manufactured from plaster casts of the customer's foot. It is conceded that the shoes are notably comfortable and that they are useful in avoiding or relieving foot discomfort which may result from ill-fitting shoes. The shoes are particularly helpful in relieving the discomfort of persons with a deformity of the foot which makes it difficult for them to find a well-fitting mass produced shoe.

The order under review prohibits the petitioners from claiming that their shoes have any therapeutic qualities with regard to certain named disorders, except insofar as the disorder or discomfort is "due to or caused by ill-fitting shoes." As we read the order it leaves petitioners free to claim that the shoes will relieve pain from foot disorders, such as bunions and hammer toes, which is attributable to tight fitting shoes, regardless of whether the condition itself was caused by tight fitting shoes. Petitioners do not seriously argue that this is an unfair standard to govern their operations. However, they do strenuously urge that the advertisements introduced in evidence do not justify the issuance of any order against them. Review in this case, therefore, concerns the evidentiary support for the charges sustained by the Commission.

Petitioners advertised their product by circulating reprints of articles about it which appeared in newspapers and magazines. It is the material in these articles, republished by petitioners, that is the basis of this proceeding. Among the statements found in the reprints introduced before the Commission are the following:

"A man who has real trouble with his feet might do well to consider the therapeutic qualites attributed to the Murray Space Shoes. * * * One man is convinced that they have helped to relieve his blood pressure! A dentist says that wearing them has relieved a sharp pain in his hip that made standing all day at his work a torture. * * *

"The Murray Glove Mould Shoe makes for perfect balance, which in turn corrects not only foot troubles, but other bodily ailments due to being out of alignment while walking and standing.

" * * * the space shoe invented by Murray and which is closely related to the profession of chiropody, orthopedics and other sciences dealing with deformities which the medical space shoe is designed to relieve or correct.

"Allen E. Murray, inventor of the Murray Space Shoe, likes to tell about a young man who had been rejected by the Navy for flat feet. He thereupon got a pair of Mr. Murray's shoes, wore them for several months and was sufficiently rehabilitated to pass his physical. * * *

"Sufferers from fallen arches, corns, bunions, mosaic warts, heel spurs, or hammer toes frequently claim amazing relief from the shoe. * * *

" * * * his shoe follows every distortion of the sick foot. His theory is that by giving the foot breathing space, it will tend to revert to a more natural shape. * * * To prove that sick feet improve when provided with enough space, Murray displays before-and-after casts of his customer's feet. He is even prouder of a three-cast series of his own left foot, showing its progress from a

piteously gnarled, hammer-toed specimen 20 years ago to its present lithe-high-arched muscular version.

"Doctors now in conference with friend Murray are studying control of the 'slipped spinal disc' by Space Shoe Magic.

"But to show what miseries can result from ill fitting shoes and how they can be made to disappear, here are a few examples:

"S.T. was a former dancer who had retired from her profession because of bunions, aching feet, indigestion and eventually stomach ulcers. An operation was advised about the time she started to wear the Glove Mould Shoes. After wearing the shoes for ten months, her feet were in complete comfort, indigestion and ulcers had vanished and she was a well and happy woman again.

"M.S. was a hairdresser who was on her feet all day. For thirteen years she was tortured with backache to such an extent that it was agony to get out of bed every morning. She spent three periods in the hospital for arthritis and paid thousands of dollars to doctors for treatments. Two weeks after wearing the Glove Mould Shoes the pain in her back disappeared, never to reappear. Life is worth while living again for M.S.

"J.T. says that after wearing the Glove Mould Shoes for five months her callouses have gone away, swollen joints have become smaller, and her ankles that had sagged outward were straightened into their normal position."

■ The Commission found that petitioners' shoes have no therapeutic or corrective qualities with respect to any disease, but that they will relieve pain or discomfort that is produced by ill-fitting shoes, especially when worn by persons having certain disorders of the feet.

There is substantial evidence on the record as a whole to support this finding, including the expert testimony of three orthopedic surgeons.

■ In deciding whether petitioners' advertising was false and misleading we are not to look to technical interpretation of each phrase, but must look to the overall impression these circulars are likely to make on the buying public. See Charles of the Ritz, etc. v. Federal Trade Commission, 143 F.2d 676, 679 (2d Cir. 1944); Ward Laboratories v. Federal Trade Commission, 276 F.2d 952, 954 (2d Cir.), cert. denied 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960). And statements susceptible of both a misleading and a truthful interpretation will be construed against the advertiser. United States v. 95 Barrels of Vinegar, 265 U.S. 438, 443, 44 S.Ct. 529, 68 L.Ed. 1094 (1924). In light of these principles, there is no serious question of the sufficiency of the proof. We have no doubt that the claims included in the circulars can be taken by the casual reader to be unqualified assertions of therapeutic worth. Indeed, it is apparently with the rule of interpretation that petitioners take issue, since they seek to engage us in a hypertechnical argument as to the meaning of each word and phrase which the Commission found to be deceptive.

■ We have examined petitioners' other arguments and have found them to be wholly without merit. There is no constitutional right to disseminate false or misleading advertisements. E. F. Drew & Co. v. Federal Trade Commission, 235 F.2d 735, 739–740 (2d Cir. 1956), cert. denied, 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed. 2d 323 (1957).

The petition to review and set aside the order is denied, the FTC order is affirmed and an order shall issue as provided for in the Federal Trade Commission Act, sec. 5(c), 52 Stat. 113 (1938), 15 U.S.C.A. § 45(c), and Rule 13(l) of this Court, 28 U.S.C.A.